MARY T. UPPINGTON, Appellant, *v.* THE CITY OF NEW YORK, Respondent.

1. MUNICIPAL CORPORATIONS — PUBLIC IMPROVEMENTS — CONSEQUENTIAL DAMAGES. Where a municipal corporation has general authority by statute to make a public improvement in a public street, which does not involve direct encroachment upon private property, it is not liable for consequential damages, unless they are caused by negligence, misconduct or want of skill on the part of its servants or agents.

2. CONSTRUCTION OF SEWER — LIABILITY FOR CONSEQUENTIAL DAMAGES TO ABUTTING PROPERTY. A municipal corporation is not chargeable with such negligence in the selection of a route or the adoption of a

plan for a sewer as will render it liable for consequential damages not caused by willful misconduct to the property of an abutting owner, produced by the settling of the ground in front of his premises due to the work of construction, when the sewer was lawful, was duly authorized by statute, and the route selected was a proper one, and the plan adopted had been in general use for years, was carefully prepared to protect both public and private interests and was reasonably safe.

3. INDEPENDENT CONTRACTORS — WHEN MUNICIPALITY NOT LIABLE FOR THEIR NEGLIGENCE. Where a municipal corporation has power to let a contract for the construction of a sewer, and it enters into such a contract with competent contractors, doing an independent business, who agree to furnish the necessary materials and labor and make the entire improvement according to specifications prepared in advance for a lump sum, or its equivalent, they are not the servants or agents of the city, but are independent contractors, and the city is not liable for their negligence, even when it reserves the right to change, inspect and supervise to the extent necessary to produce the result intended by the contract, provided the plan is reasonably safe, the work is lawful, is not a nuisance when completed, and there is no interference therewith by municipal officers, which results in injury.

*Uppington* v. *City of New York*, 44 App. Div. 630, affirmed.

(Submitted November 21, 1900; decided January 8, 1901.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered October 13, 1899, affirming a judgment in favor of defendant entered upon a verdict directed by the court.

This action was brought by an abutting owner upon Greene avenue, in the borough of Brooklyn, to recover damages alleged to have been sustained from injuries to her house through the construction of a sewer by means of an open trench in said street. The sewer is known as a relief sewer, laid to carry off surface water which, after heavy storms, flooded a portion of the city quite remote from the plaintiff's property.

Upon the trial there was evidence tending to show that the trench, dug for the purpose of laying the sewer, caused the ground to settle in front of the plaintiff's premises and injured her house to the extent of $1,500, as claimed by her, although the jury upon the first trial assessed her damages at the sum of $500. The verdict was set aside, however, upon appeal, and a new trial was granted on the ground that she had not

made out a cause of action. Upon the second trial, which is now under review, the same facts appeared, and at the close of all the evidence the trial judge directed a verdict for the defendant.

Greene avenue is a public street, 70 feet wide and 35 feet from curb to curb. It is well built up with dwellings upon either side, ranging from $2\frac{1}{2}$ to $3\frac{1}{2}$ stories in height. The most of the buildings stand back 10 feet from the line of the street, while some, including that of the plaintiff, stand upon the line. The soil under the street is compact gravel and sand, and contains boulders, some of which are four or five feet in diameter. The depth of the excavation in front of the plaintiff's premises was about 35 feet, the width at the top 18 feet, and the sewer was 10 feet in diameter, when measured inside. The entire length of the sewer, including branches, was more than three miles, but for the most of that distance the diameter ranged from five feet to 12 inches, although for a part of the way it was from 12 to 15 feet.

The work was let to the firm of James J. Moran & Co., who agreed to construct the sewer according to the specifications, and furnish all the materials and labor required, for a given sum per running foot, varying with the size. The method of construction provided by the specifications was through an open trench, to "be opened one foot wider on each side than the exterior diameter of the sewer," which was to be twelve feet. The sides of the excavation were to be "supported with suitable plank and shoring, whenever necessary." The contractors were required at their own expense to "shore up, protect, restore and make good, as may be necessary, all buildings, walls, fences, or other properties which may be disturbed or injured during the progress of the work;" "to do everything necessary to protect, support and sustain the buildings on both sides of the street," and were to "be held responsible for all damages which may happen to neighboring properties." A sufficient quantity of timber and plank was to be kept constantly upon the ground and used "as required for bracing and sheathing the sides of the excavation." Before

breaking ground written notice of at least twenty-four hours
was to be given to all persons whose interests might be affected
by operations under the contract. The contractors were to
promptly remove the surplus earth, relay crosswalks, replace
broken stones, regrade and repave the streets to the extent
required by the work, and keep the materials excavated so
trimmed as to be of as little inconvenience as possible to the
public and the adjoining tenants. All damages resulting to
buildings, etc., through the negligence of the contractors were
to be paid by them, and they were required to give a bond to
indemnify the city against all suits brought on account of inju-
ries sustained through the construction of the work, " or by or
on account of any act or omission of " the contractors or their
agents. In addition to this, the city was authorized to retain
enough money otherwise going to the contractors to make good
all losses to third persons. The city engineer was to " have
the right to regulate the excavation," and not " more than 400
feet of trench " was to be opened at one time without his per-
mission, while the commissioner of city works was authorized
to " change at his discretion the amount of all the various
kinds of work and materials and structures." The contract-
ors were required to observe all the ordinances of the common
council in relation to obstructing the streets, and " in all cases
of rock blasting the blast " was " to be carefully covered with
heavy timber, according to the ordinances of the common
council " relating to the subject, " which ordinances shall be
strictly observed." If any person employed by the contractor
should " appear to the engineer to be incompetent or disor-
derly " he was to be discharged and not employed again with-
out permission. The engineer, with the consent of the com-
missioner, had power " to vary, extend or diminish the quantity
of work during its progress without vitiating the contract." It
was also provided that " all explanations and directions neces-
sary to the carrying out and completing satisfactorily the dif-
ferent descriptions of work contemplated and provided for
under this contract will be given by said engineer." The city
had the right to inspect the work and materials to see that

they corresponded with the specifications. Any materials or implements brought upon the ground which the engineer " should deem to be of improper description or improper to be used in the work," were to be removed forthwith. The contractors were to have charge of and be responsible for the entire line of work until its completion and acceptance, and were not to be paid for any part thereof until the whole sewer was finished. The specifications contained many provisions relating to details of the work that are usually found in municipal contracts for the building of sewers.

The plaintiff's lot, as described in her deed, begins at a fixed point " on the southerly side of Greene avenue," and the third course runs " to the southerly side of Greene avenue and thence " by the fourth course " westerly along Greene avenue to the place of beginning." The house on said lot consisted of three stories and a basement and cost $9,300.

Further facts are stated in the opinion.

*James Troy* for appellant. The power to build this sewer was merely permissive and discretionary. (*Morton* v. *Mayor, etc.,* 140 N. Y. 207; *Cogswell* v. *N. Y., N. H. & H. R. R. Co.,* 103 N. Y. 10; *Hill* v. *Mayor, etc.,* 139 N. Y. 495; *D., L. & W. R. R. Co.* v. *City of Buffalo,* 158 N. Y. 266; *Seifert* v. *City of Brooklyn,* 101·N. Y. 136.) A contractor is only independent when not subject to the orders, directions or control of his employer, but whenever the latter reserves the right to order, direct or control the former in the performance of the work, the contractor is to the extent of such reservation the mere agent or servant of the employer, who is liable for injuries resulting from his negligence. In constructing the sewer on Greene avenue the contractors were the agents and servants of the city. (*Goldschmid* v. *Mayor, etc.,* 14 App. Div. 135.) If the city had the right to control the manner of doing any of the work, although the contractors were otherwise independent, it is liable for negligence to that extent. (*Storrs* v. *City of Utica,* 17 N. Y. 104; *Goldschmid* v. *Mayor, etc.,* 14 App. Div. 135.)

The general rule exempting an employer from liability for the negligence of an independent contractor does not apply where the contract requires the performance of work intrinsically dangerous, however skillfully performed; in such a case the party authorizing the work is justly regarded as the author of the mischief resulting from it, whether he does the work himself or lets it out by contract. (2 Dillon on Mun. Corp. [4th ed.] §§ 1029, 1031; *White* v. *Mayor, etc.*, 15 App. Div. 443; *Goldschmid* v. *Mayor, etc.*, 14 App. Div. 135; *Weber* v. *Buffalo Ry. Co.*, 20 App. Div. 292.) The city is liable for the continuance of the work without change of plan or precaution after notice that injury would follow. (*Seifert* v. *City of Brooklyn*, 101 N. Y. 136.) Injuries occasioned by negligence involve liability to the full extent thereof. (*Vaughan* v. *Vaughan*, 3 Bing. [N. C.] 468; *Milburn* v. *Fowler*, 27 Hun, 568; *Finegan* v. *Eckerson*, 32 App. Div. 233; *Finegan* v. *Eckerson*, 26 Misc. Rep. 574.)

*George W. Wingate* for property owners. The Appellate Division was in error in assuming that because the deed to the plaintiff did not extend to the center of the street that the city, as the owner of said highway, had the same right to make excavations therein as the common law permitted to be done by an individual upon property which adjoined that of another. (*Ratcliffe* v. *City of Brooklyn*, 4 N. Y. 203; L. 1894, ch. 481, § 1, subd. 4; L. 1886, ch. 583, tit. 14, § 59; charter of Brooklyn, 1873, tit. 2, § 26.) The excavation which was made through Greene avenue for the construction of the sewer in question was of such a magnitude as constituted a diversion of the street from the purposes for which it was dedicated and which, therefore, entitled the abutting owners to recover the damages which they sustained through such diversion. (*Bohm* v. *M. El. R. Co.*, 129 N. Y. 587; *Lahr* v. *M. El. R. Co.*, 104 N. Y. 268; *N. Y. Nat. E. Bank* v. *M. El. R. Co.*, 108 N. Y. 660.) The Appellate Division was in error in treating this matter as one of consequential damages. (*Am. B. N. Co.* v. *N. Y. El. R. R. Co.*, 129 N. Y.

271.)   The rule in regard to independent contractors has no application.   (4 Dillon on Mun. Corp. [4th ed.] §§ 1029, 1031.)

*John Whalen, Corporation Counsel* (*William J. Carr and R. Percy Chittenden* of counsel), for respondent.   Public officers lawfully employed in making public improvements, and corporations engaged in the performance of work of a public nature authorized by law, are not liable for consequential damages occasioned by it to others, unless caused by misconduct, negligence or unskillfulness.   (*Atwater* v. *Trustees Vil. of Canandaigua,* 124 N. Y. 602; *Radcliff* v. *Mayor, etc.,* 4 N. Y. 195; *Bellinger* v. *N. Y. C. R. R. Co.,* 23 N. Y. 42; *Moyer* v. *N. Y. C. & H. R. R. R. Co.,* 88 N. Y. 351; *Uline* v. *N. Y. C. & H. R. R. R. Co.,* 101 N. Y. 98; *Booth* v. *R., W. & O. T. R. R. Co.,* 140 N. Y. 270; *Engel* v. *Eureka Club,* 137 N. Y. 103; *Benner* v. *A. D. Co.,* 134 N. Y. 156; 2 Dillon on Mun. Corp. § 991; *City of Quincy* v. *Jones,* 76 Ill. 231; *Hall* v. *Bristol,* L. R. [2 C. P.] 322.)   The plans adopted by the city were reasonably safe and proper, and care and skill were employed in their adoption.   (*Ely* v. *City of Rochester,* 26 Barb. 136.)   The contractor was not negligent.   (*Benner* v. *A. D. Co.,* 134 N. Y. 156; *Booth* v. *R., W. & O. T. R. R. Co.,* 140 N. Y. 267; *French* v. *Vix,* 2 Misc. Rep. 316.)   The city was not liable for its contractor's negligence, because the work was not necessarily dangerous, and the contractor was independent.   (*Engel* v. *Eureka Club,* 137 N. Y. 103; *Goldschmid* v. *Mayor, etc.,* 14 App. Div. 138; Tiedeman on Mun. Corp. § 329; *McCafferty* v. *S. D. & P. M. R. R. Co.,* 61 N. Y. 178; *Kelly* v. *Mayor, etc.,* 11 N. Y. 432; *Pack* v. *Mayor, etc.,* 8 N. Y. 222; *Erie* v. *Vaulkins,* 85 Penn. St. 247; *Samuelson* v. *Cleveland,* 49 Mich. 164; *Blumb* v. *City of Kansas,* 84 Mo. 112; *Cuff* v. *N. & N. Y. R. Co.,* 35 N. J. L. 17; *Charlock* v. *Freel,* 125 N. Y. 357.)

VANN, J.   When a municipal corporation has general authority by statute to make a public improvement in a public street, which does not involve direct encroachment upon

private property, it is not liable for consequential damages, unless they are caused by negligence, misconduct or want of skill on the part of its servants or agents. (*Atwater* v. *Trustees of Canandaigua*, 124 N. Y. 602; *Radcliff* v. *Mayor, etc.*, 4 N. Y. 195; *Transportation Co.* v. *Chicago*, 99 U. S. 635; 2 Dillon on Munic. Corps. § 1029; Shearman & Redfield's Negligence, § 272.)   In such cases the corporation is the agent of the state, and acts done in the proper exercise of governmental powers do not make such agent liable at common law, even if they indirectly affect but do not directly invade private property.   If the work is unlawful, the injury willful, or the damages are owing to the failure of the proper authorities to exercise due care or skill, there is no exemption from liability, even when the undertaking is wholly for the benefit of the public.

The relief sewer, which is the subject of this controversy, was lawful, because it was built wholly in a public street, without encroaching upon private property, and was duly authorized by statute.   Such damages as were inflicted upon abutting property were an indirect result of the work and were not caused by willful misconduct.   The controlling question is whether they were owing to the omission of some municipal duty, or, in other words, whether the city, through its representatives, was guilty of negligence, which includes want of skill whenever the exercise of skill is required by law.   This question, for convenience, may be resolved into the following subordinate questions : (1) Whether the defendant was negligent in selecting an improper route or adopting an ·improper plan for the construction of the sewer; (2) whether James J. Moran & Company were independent contractors, as that phrase is known in law ; (3) whether said contractors, if not independent, were negligent in executing the work.

The city was not obliged, at its peril, to select the best possible route or to adopt the best possible plan, provided the route selected and the plan adopted were reasonably safe. While the statute which conferred the power did not provide

.that this particular sewer should be built in any particular street, it was without limitation, and, hence, the city had control of the method of making the improvement. The route and plan adopted promoted the interest of the public, but two experts called by the plaintiff testified, in view of what had happened and not in anticipation of what might happen, that construction by means of a tunnel would have caused less settling of the ground and less danger to abutting property than construction by an open trench. The city employed engineers conceded to be competent, who, after long and careful study of the subject, recommended the route and plan finally determined upon. That the route thus selected was a proper one, according to the evidence, does not admit of discussion.

The city was bound to exercise due care to see that the plan decided upon was reasonably safe, but its " rights were superior to those of persons engaged in work private in character." (*Atwater* v. *Trustees, supra.*) The plan adopted had been in general use for years. It was carefully prepared to protect both public and private interests. The tunnel plan, while safer in most respects, is dangerous to some extent, as well as more expensive. It causes less settling of the ground and prevents interference with travel, but inspection is more difficult and inferior work less apt to be discovered. It was not in general use, for almost all sewers in this country, at the time the plan was adopted, were laid in open cuts. " The tunnel is the exception, not the rule." There are three methods of tunneling, known as the timber, shield and pilot systems. One of the plaintiff's experts condemned the timber method as dangerous at the place in question, and testified that the pilot system was the best, although he had never seen it in operation. The other expert sworn for the plaintiff also preferred the pilot system, but said that he had never used it and that it was of recent origin. Even by the pilot system there are intervals of time when portions of the earth above are unsupported before the sustaining plates are put in, and while the interval is short, subsidence of the soil may take place before the support is adjusted.

Engineering conditions required the sewer to be placed about 35 feet beneath the surface of the street in front of the plaintiff's property, which left insufficient lateral pressure of the soil to prevent undue vertical pressure upon the work of excavating a tunnel. A sewer only 10 feet in diameter cannot be conveniently built by means of a tunnel, owing to the lack of room for workmen, and the city had never used that method under the circumstances named. The inconvenience of building a sewer but 10 feet wide by the tunnel method was illustrated by actual experience on the work in question, as it was necessary, for a part of the way, to tunnel under a hill eighty feet high, yet the contractor testified that he asked and obtained permission from the city authorities to make a sewer 12 feet in width, without additional charge, although the contract called for one only 10 feet wide. Even that tunnel, at that depth, caused some damage to abutting property, and it cost $58 more per running foot than where a cut was made.

Furthermore, there was a sewer in actual use 12 feet below the surface of the street, which, in case of leakage, might flood the tunnel and make it dangerous to adjacent property through settling of the moist soil. The city wished to remove that sewer from the street altogether, which would have been impossible except by the trench system. The presence of boulders in the soil made the tunnel plan less feasible than it otherwise would have been. The experience of the city was against it. No expert expressly condemned the plan adopted, and a large majority, including those of the highest standing and greatest experience, preferred it. The specifications made careful provision to protect the property of abutting owners by shoring, sheathing and otherwise, as well as to compel the contractors to make good any loss that might happen.

The fact that the engineers of the city expected there would be some damage to sidewalks and stoops before they adopted the plan does not show that it was defective, because some damage would have resulted from any plan. Consequential damages, more or less serious, naturally result from making extensive improvements in a public street occupied with dwel-

lings standing upon either side. The city, however, is not liable therefor at common law so long as they are confined to consequences that are the necessary and usual result of the proper exercise of the power to make the improvement. A change of grade may leave some houses too high and others too low, either to look well or to be conveniently used with reference to the street, yet, even if the change is such as to endanger their stability, the city is not responsible at common law, although the subject has been regulated by statute to some extent in certain cities. (*Radcliff* v. *Mayor, etc., supra.*) As was said in *Atwater* v. *Trustees* (*supra*), which is an instructive case, "serious injury to property may be occasioned by the lawful exercise of powers of public character pursuant to law, and if the work is carefully and skillfully performed the consequences may be *damnum absque injuria* when the legislature has provided for no compensation. In such case the protection of the owner of property not taken or appropriated, which may be subjected to hazard or injury, is in the care and skill to be observed by those engaged in the execution of the work. If they fail to do that they are liable for the consequences of such failure."

We think the evidence before us, even with every permissible inference drawn in favor of the plaintiff, would not permit a jury to find that the plan of construction was not reasonably safe. While some facts bearing on the principal question were in controversy, the uncontradicted evidence, when considered in connection with those facts, assuming them to be found according to the plaintiff's theory, left no question of fact as to the reasonable safety of the plan.

When a municipal corporation furnishes its own materials and makes a public improvement through agents selected by itself, with power to discharge them at will, and to direct them as to details of the work, they are its servants, and the master who selects and controls them is liable for their negligence. They are, so to speak, the hands and arms of the city, to do its will, as the hands and arms of a man do his will.

When, however, the city has power to let the work and it

enters into contract with competent contractors, doing an independent business, who agree to furnish the necessary materials and labor and make the entire improvement according to specifications prepared in advance, for a lump sum, or its equivalent, they are not the servants or agents of the city, but are independent contractors, and the city is not liable for their negligence, even when it reserves the right to change, inspect and supervise to the extent necessary to produce the result intended by the contract, provided the plan is reasonably safe, the work is lawful, is not a nuisance when completed, and there is no interference therewith by municipal officers, which results in injury. (*Berg* v. *Parsons,* 156 N. Y. 109; *Engel* v. *Eureka Club,* 137 N. Y. 100; *Butler* v. *Townsend,* 126 N. Y. 105; *Charlock* v. *Freel,* 125 N. Y. 357; *Herrington* v. *Village of Lansingburgh,* 110 N. Y. 145; *Ferguson* v. *Hubbell,* 97 N. Y. 507; *Town of Pierrepont* v. *Loveless,* 72 N. Y. 211; *Kelly* v. *The Mayor,* 11 N. Y. 432; *Pack* v. *The Mayor,* 8 N. Y. 222; *Blake* v. *Ferris,* 5 N. Y. 48; *Reedie* v. *London & N. W. R'way Co.,* 4 Exch. 244; *Overton* v. *Freeman,* 21 L. J. C. P. 52.) Independence of control in employing workmen and in selecting the means of doing the work is the test usually applied by courts to determine whether the contractor is independent or not.

James J. Moran & Company, as competent contractors, undertook the independent business of building the sewer in question with their own materials and their own men, for, by specific agreement, they were to furnish both. They represented the will of the defendant as to the result of the work, but not as to the means of doing it. The men, the machinery and the details were all under their control. The city could not employ workmen for them, nor direct the workmen employed by them. It could not select the tools and appliances to be used, nor require them to be used in any particular way or at any particular time. The will of the contractors, not of the city, controlled in these respects. While certain municipal officers could require the contractors to discharge incompetent workmen, that did not make the work-

men not discharged the servants of the city, nor empower it to fill the places of those discharged with men of its own selection.

Stipulations to secure faithful compliance with the specifications on the part of the contractors do not make them servants of the city, as was held in *Kelly* v. *The Mayor (supra)*, where the contract contained the following clause: "The whole work to be done under the direction and to the entire satisfaction of the commissioner of repairs and supplies, the superintendent of roads and the surveyor having charge of the work." The contractor in that case also "agreed to do the work, to take all necessary precautions for the prevention of accidents or injuries to persons or property and to indemnify the corporation against all loss or damage by reason of any neglect or unskillfulness in its performance." The court said: "The clause in question clearly gave to the corporation no power to control the contractor in the choice of his servants; that he might make his own selection of workmen will not be denied. This right of selection lies at the foundation of the responsibility of a master or principal for the acts of his servant or agent. * * * As a general rule certainly no one can be held responsible as principal who has not the right to choose the agent from whose act the injury flows. * * * The object of the clause relied upon was not to give to the commissioner of repairs and the other officer named the right to interfere with the workmen and direct them in detail how they should proceed, but to enable them to see that every portion of the work was satisfactorily completed. It authorized them to prescribe what was to be done, but not how it was to be done nor who should do it."

So in *Pack* v. *The Mayor (supra)* the contract provided that the work was to be done according to certain specifications, and the contractor also agreed to "conform the work to such further directions as should be given by the street commissioner and one of the city surveyors," yet it was held that this was "nothing more than a stipulation for a change of the specification of the work, as stated in the contract, at fixed prices provided therein. It does not, as the court below held,

make Riley the immediate servant of the defendants nor give to them any control over him as to the manner or otherwise in which he should conduct the blasting." See, also, *Charlock* v. *Freel* (125 N. Y. 357), where the city reserved the right to " vary, extend or diminish the quantity of work during its progress " and authorized the engineer to fix the price of all work not included in the contract.

As was said by the learned Appellate Division, the " supervisory powers related to the character of the work performed for the then city of Brooklyn and not to the relations of the contractors with third persons." Those relations were not interfered with by the city, which, however, made careful provision for the protection of abutting property by shoring it up, sheathing the trench and the like, but leaving to the contractors full control of the means and method of doing it. While the contract provided that it should be done, it did not provide how it should be done. " To make the city liable it must have the power to direct and control the manner of performing the very work in which the carelessness occurred." (*Vogel* v. *The Mayor*, 92 N. Y. 10, 18.)

James J. Moran & Co. were not servants employed in the business of a master and subject to his control as to all parts of the work, but were independent contractors engaged in making an entire improvement, free from control as to the manner of performance, although subject to instructions as to results. The plan was reasonably safe, the work was lawful, was not interfered with by the city to the injury of the plaintiff and was not a nuisance when performed. We think the city was liable neither for the negligence of the contractors nor that of their agents or servants.

The contractors were, of course, liable for their own negligence, but the conclusion already reached makes it unnecessary to consider that subject upon this appeal.

The judgment should be affirmed, with costs.

PARKER, Ch. J., O'BRIEN, BARTLETT, HAIGHT, MARTIN and LANDON, JJ., concur.

Judgment affirmed.