SIERRA CLUB, Plaintiff,

v.

UNITED STATES DEPARTMENT OF ENERGY, and Rockwell International Corporation, a Delaware corporation, Defendants.

Civ. A. No. 89–B–181.

United States District Court, D. Colorado.

April 12, 1990.

Adam Babich, Cornwell & Blakey, Denver, Colo., for plaintiff.

Craig Schaffer, Environmental Defense Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., William G. Pharo, Asst. U.S. Atty., Denver, Colo., Ben Underwood, U.S. Dept. of Energy, Washington, D.C., and Gregory Fess, U.S. Dept. of Energy, Golden, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

This is a citizen's enforcement action under the Resource Conservation and Recovery Act (RCRA). Plaintiff Sierra Club moves for partial summary judgment seeking declarations that certain materials

mixed with plutonium, once burned and now stored at the Rocky Flats Plant, are subject to RCRA regulations as hazardous waste within the meaning of Subtitle C of RCRA, 42 U.S.C. §§ 6901–6991i.

Rocky Flats is owned by defendant United States Department of Energy (DOE) and was operated by its contractor, defendant Rockwell International Corporation (Rockwell). Rockwell also filed a Motion for Partial Summary Judgment but Sierra Club and Rockwell recently entered into a settlement agreement resulting in Rockwell's dismissal.

DOE does not dispute Sierra Club's factual or legal assertions. Rather, DOE argues that I should decline to rule on plaintiff's motion for partial summary judgment because determination of RCRA's applicability is "logically related" only to the appropriate scope of injunctive relief. DOE also relies on the doctrine of primary jurisdiction to assert that I should delay this litigation indefinitely to await the outcome of negotiations contemplated by a November 3, 1989 DOE/State of Colorado Agreement.

There has been extensive briefing by all parties. Oral argument on Sierra Club's motion was heard Friday, March 30, 1990 at 1:30 p.m. Upon consideration of the parties' submissions and of the applicable law, I determine that there are no genuine issues of fact material to Sierra Club's motion, Sierra Club is entitled to judgment as a matter of law, and there is no persuasive reason to defer this ruling. Accordingly, I hold that: 1) all substances listed at 40 C.F.R. Part 261, Subpart D or possessing characteristics set forth at 40 C.F.R. Part 261, Subpart C, and that defendants have burned in an incinerator or are storing pending treatment in a plutonium recovery process are RCRA Subtitle C hazardous wastes; 2) all substances (except plutonium) mixed with listed hazardous wastes are RCRA Subtitle C hazardous wastes; and 3) all residues (except plutonium) from incineration or other treatment in a plutonium recovery process of hazardous wastes are RCRA Subtitle C hazardous wastes.

Congress enacted RCRA to end ever-increasing damage to the environment and public health resulting from mismanagement of hazardous waste. 42 U.S.C. § 6901(b)(5). *See generally Wycoff Co. v. EPA,* 796 F.2d 1197 (9th Cir.1986). RCRA and its accompanying regulations establish a comprehensive program for handling hazardous wastes. The United States Environmental Protection Agency (EPA) is charged with administering RCRA. However, RCRA is implemented in Colorado largely by regulations promulgated by the state under the Colorado Hazardous Waste Management Act, C.R.S. §§ 25–15–301 *et seq.* Colorado's hazardous waste regulations, 6 CCR 1007–3, are substantially identical to the EPA's regulations found at 40 C.F.R. Parts 260–270. Consequently, analysis of the federal scheme overlays and defines that of Colorado.

Generally, RCRA prohibits the treatment, storage, or disposal of hazardous waste at both private and governmental facilities without a permit issued by EPA or an authorized state. 42 U.S.C. § 6925(a); *See also* 42 U.S.C. § 6961. RCRA requires that the owner or operator of all facilities for treatment, storage, or disposal of hazardous waste apply for hazardous waste permits by November 19, 1980, or within 6 months after changes in the law first subject the facilities to regulation. 42 U.S.C. § 6925(a).

Congress deemed it impractical to halt all hazardous waste activity pending the issuance of permits. Therefore, RCRA allows existing facilities such as Rocky Flats to "be treated as having been issued [a] permit" pending issuance or denial of an actual permit" or to operate under "interim status." 42 U.S.C. § 6925(e)(1); *United States v. T & S Brass and Bronze Works, Inc.,* 681 F.Supp. 314, 316 (D.S.C.) *aff'd in part, vacated in part,* 865 F.2d 1261 (4th Cir.1988).

Since November 1980, DOE, through its operator, has been obligated, but has failed, to apply for a RCRA permit for hazardous waste operations at Rocky Flats. Throughout that time, DOE has claimed that either all hazardous waste at Rocky

Flats was exempt from the RCRA permit requirements or that RCRA does not apply to mixed radioactive and hazardous waste. In July 1986, after the Colorado Department of Health threatened to close Rocky Flats unless DOE managed its mixed waste in compliance with RCRA, EPA issued a notice that RCRA applies to "mixed waste." 51 Fed.Reg. 24504 (July 3, 1986). Two years later, EPA announced that it would treat the notice as if it were a regulatory change to allow facilities such as Rocky Flats to gain interim status under 42 U.S.C. § 6925(e)(1). However, DOE has never gained interim status with respect to that waste. Nor has DOE applied for a permit or interim status for residues that are stored, treated, or incinerated at the plant.

Furthermore, DOE never applied for a permit to treat, store, or dispose of the mixed waste. Until recently this mixed waste was burned in building 771. Plutonium was then recovered from the ash. This mixed waste is now stored at the plant.

Recently, DOE agreed to shut down the building 771 incinerator until the EPA or Colorado issues a final RCRA permit authorizing mixed waste incineration. However, DOE did not agree to treat, store, or dispose of the mixed waste formerly burned in building 771 or the residue from prior incineration at building 771 in compliance with RCRA. Similarly, DOE has not agreed to "close" (i.e. decontaminate) the incinerator in compliance with RCRA regulations. Accordingly, the issue before me is ripe for determination.

RCRA has statutory and regulatory definitions of "hazardous waste." The broad statutory definition, 42 U.S.C. § 6903(5), primarily governs actions to abate imminent and substantial risks to the public and environment. *See e.g.,* 42 U.S.C. § 6973. Sierra Club's motion, however, involves the regulatory definition which applies to the RCRA Subtitle C regulatory program. *See* 42 U.S.C. § 6925(a); *See also Chemical Waste Management, Inc. v. EPA,* 869 F.2d 1526 (D.C.Cir.1989) (*CWM*).

EPA has listed RCRA Subtitle C hazardous wastes at 40 C.F.R. Part 261, Subpart D. Additionally, EPA set characteristics that identify hazardous waste at 40 C.F.R. Part 261, Subpart C. DOE admits that halogenated solvents, xylene, methanol and carbon tetrachloride have been incinerated in building 771. *See* DOE's Final Environmental Impact Statement for the Rocky Flats Plant Site, dated April 1980. These substances are listed in 40 C.F.R. Part 261, Subparts C and D.

EPA's definition of RCRA Subtitle C hazardous waste is supplemented by regulations known as 1) the "mixture rule" and 2) the "derived from rule." *See generally, CWM,* 869 F.2d at 1538 n. 14, and at 1539. Under the "mixture rule," a solid waste mixed with a listed hazardous waste is a hazardous waste. 40 C.F.R. § 261.3(a)(2)(iv). Thus, for example, used kimwipes contaminated with solvents listed under 40 C.F.R. Part 261, Subpart D not only contain hazardous waste, the kimwipes themselves are hazardous waste. Under the mixture rule, all of the trash formerly burned in building 771 and now stored onsite that is or has been mixed with substances listed at 40 C.F.R. Part 261, Subpart D, is hazardous waste. 40 C.F.R. § 261.3(a)(2)(iv).

The "derived from rule," subject to certain exceptions not at issue here, provides that "any solid waste generated from the treatment ... of a hazardous waste ... is a hazardous waste." 40 C.F.R. § 261.3(c)(2)(i); *CWM,* 869 F.2d at 1530; *See* 54 Fed.Reg. 1056, 1063 (preamble to proposed rule regarding land disposal restrictions, Jan. 11, 1989) ("all of the residues from treating the original listed wastes are likewise considered to be the listed waste by virtue of the derived-from rule"). *See also* 45 Fed.Reg. 33084, 33096 (May 19, 1980). Consequently, residue from the burning of waste listed at 40 C.F.R. Part 261, Subpart D, or possessing characteristics set forth at 40 C.F.R. Part 261, Subpart C, is also hazardous waste regardless of whether it contains substances on the Subpart D list or exhibits Subpart C characteristics.

An exception to the definition of hazardous and solid waste is provided in 42 U.S.C.

§ 6903(27). That section states that a "source, special nuclear, or byproduct material as defined by the Atomic Energy Act," 42 U.S.C. § 2011 *et seq.*, (AEA) is not solid waste.

■ DOE, however, does not claim that the AEA shields it from RCRA regulation. To the contrary, Sierra Club and DOE agree that the AEA "appears directed only to the radioactive component of nuclear waste," and that the hazardous component of "mixed waste" must be managed as hazardous waste whether or not the radioactive component of the mixed waste is subject to regulation. 52 Fed.Reg. 15937, 15940 (May 1, 1987); 10 C.F.R. § 962.3(b); *See Legal Environmental Assistance Foundation (LEAF) v. Hodel,* 586 F.Supp. 1163 (E.D.Tenn.1984). Once the plutonium is separated from the hazardous waste, the plutonium itself is clearly no longer subject to RCRA. Moreover, it is undisputed that RCRA regulation of the materials at issue here will not prevent plutonium recovery, but plutonium *mixed* with this waste is itself hazardous waste.

In *American Mining Congress v. EPA,* 824 F.2d 1177, 1187 n. 14 (D.C.Cir.1987) (*AMC*), the D.C. Circuit recognized that materials containing valuable constituents that ultimately may be recovered can nonetheless be hazardous waste. The Court expressly distinguished between "materials recycled in an industry's on-going production process" and "materials disposed of and recycled as part of a waste management program." *Id.* at 1179. The Court applied common sense statutory interpretation to determine that materials from one stage of industrial process passing in a continuous stream or flow into another stage of the process, are not "waste" and thus were not intended by Congress to be subject to RCRA. *Id.* at 1185. It noted that Congress defined "solid waste" as "discarded material" and that the plain meaning of "discard" is "disposed of," "thrown away," or "abandoned." *Id.* at 1183–1184. The Court also noted that the dictionary definition of discard is "... to get rid of as no longer useful, valuable, or pleasurable." *Id.* at n. 7. The holding

determined that Congress did not use the term "discard" to "encompass materials no longer useful in their original capacity though 1) destined for *immediate* reuse 2) in another phase of the industry's *ongoing* production process." *Id.* at 1185. (Emphasis added). It was emphasized that the Court's ruling applies only to *"materials [that] have not yet become part of the waste disposal problem;* rather they are destined for beneficial reuse or recycling in a *continuous* process by the generating industry itself." *Id.* at 1186. (Emphasis added). The Court distinguished from its holding those situations in which "the material has become 'hazardous waste' by being disposed of, and then is generated and reinserted on-site in the refining process." *Id.* at 1188.

In *Chemical Waste Management, Inc. v. EPA,* 869 F.2d 1526 (D.C.Cir.1989) (*CWM*), the same Court recognized the "mixture" and "derived from" rules and upheld the consistent regulatory principle that a hazardous waste remains subject to RCRA regulation even if it is combined with other substances. *CWM,* 869 F.2d at 1539. This same principle is evidenced in 10 C.F.R. § 962.3(b), in which DOE concedes that materials mixed with "source, special nuclear or byproduct material" are not exempt from RCRA's definition of "solid waste." Thus, the balance of the waste is hazardous waste, even if contaminated with plutonium and it remains subject to regulation unless it is in-process, secondary material passing in a continuous stream from one production process to another. *AMC,* 824 F.2d at 1190.

*AMC* and *CWM* applied here, lead me to conclude that the materials at issue are part of the waste disposal problem that Congress intended to regulate under RCRA. *See AMC, supra* at 1186. Unregulated storage of such waste is the precise hazard *AMC* avoided by limiting its holding to materials reused in an "ongoing manufacturing process." *Id.* DOE stores its contaminated trash for discard. It then discards the trash by burning it, eventually recovering plutonium from the ash. Hence, "the material has become 'hazardous waste by being disposed of,' and then

[the plutonium component of it] is generated and [later] reinserted on-site...." *See id.* at 1188. The burning or other treatment of kimwipes, solvents, and other combustibles is "contrary to their original intended use." *Id.* at 1189. Neither the hazardous waste nor the plutonium mixed with it is destined for "immediate" reuse and neither passes "in a continuous stream or flow from one production process to another." Instead, the mixed waste is stored for incineration that allows "ultimate" recovery of plutonium. *See id* at 1190.

Although DOE does not dispute that the mixed waste here is subject to RCRA, DOE argues that I should delay ruling on Sierra Club's motion because any ruling would impede or negate DOE's November 3, 1989 agreement with Colorado. That "agreement" sets forth a commendable framework for DOE and Colorado to negotiate to bring residues at Rocky Flats into RCRA compliance. Specifically, the Agreement provides that: 1) "Residues" are defined as materials "considered by DOE" to be recyclable; 2) DOE shall submit a final "Residue Classification Plan" by January 31, 1990 for determining which residues at Rocky Flats are hazardous wastes; 3) DOE shall submit a Residue Classification Report by June 1, 1990 containing DOE's position on which residues at the plant are hazardous wastes; 4) DOE shall submit a "Residue Compliance Plan" by September 28, 1990; 5) DOE's various submittals are subject to Colorado's approval; 6) All deadlines in the DOE/Colorado Agreement may be delayed under various circumstances (Colorado reserves its right to withdraw from the Agreement and proceed in court if there is a delay); and 7) If DOE and Colorado cannot agree they will negotiate or litigate.

Unfortunately, the "agreement," commendable though it may be, is indefinite in many respects. First, item 7 indicates that this may be an agreement to agree which is really no agreement at all. Second, the deadlines are flexible. Indeed, there is no deadline for compliance. Third, the residues are defined subjectively by DOE. Finally, the agreement does not address or resolve the very issue presented in this citizen's enforcement action, a legal issue unresolved for over a decade.

In construing the applicable statutes and regulations in light of *AMC* and *CWM*, a judicial function, I set no deadlines and perform no administrative or regulatory function. Contrary to DOE's fear that a ruling on Sierra Club's motion might impede or negate its pact with Colorado, once it is established as a matter of law that the mixed waste in this action is indeed "hazardous waste" subject to RCRA, DOE can move expeditiously to develop and implement a reasonable compliance schedule and plan in cooperation with Colorado. A ruling here necessarily lends definition, direction, stability, and impetus to the DOE and Colorado cooperative effort. Despite DOE's contention that a ruling may give rise to "conflicting regulatory requirements," DOE has identified no such conflicts.

■ DOE, invoking the doctrine of initial primary jurisdiction, *see United States v. Environmental Waste Control, Inc.,* 710 F.Supp. 1172, 1193 (N.D.Ind.1989), further argues that I should delay ruling on Sierra Club's motion pending the outcome of civil negotiations with Colorado. I decline to invoke the doctrine of initial primary jurisdiction.

Initial primary jurisdiction is a discretionary doctrine that allows courts to defer to an administrative agency for its views where enforcement of a claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body. *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). However, the doctrine does not require that every claim touching on a regulated industry be first submitted to the regulatory agency. *Williams Pipe Line Co. v. City of Mounds View,* 651 F.Supp. 551, 565 n. 29 (D.Minn. 1987). "Even where primary jurisdiction applies, it generally does not defeat the court's jurisdiction ...; it merely delays judicial consideration of a claim until the

proper regulatory agency has given its views on the matter." *Id.* (Citations omitted).

Here, the EPA, the administrative agency charged by Congress with administering RCRA, already has expressed its views clearly and unambiguously. It has implemented its interpretation of the law in final rulemakings. EPA issued its December 19, 1988 determination that the mixed waste at issue is hazardous waste and that, in general, waste remains waste even if mixed with plutonium:

> The alleged recycled materials, or materials from which plutonium is allegedly recovered, are hazardous wastes and such wastes are "treated" (i.e. destroyed or disposed of), regardless of what may happen to the plutonium. Recycling or recovery of one material does not exempt proper handling, treatment, and disposal of accompanying or related materials.

EPA December 19, 1988 statement regarding Compliance Issues at Rocky Flats, EPA ID #CO7890010526, at p. 3. Similarly, in a preamble to a proposed rule, EPA expressed its interpretation of the *AMC* opinion:

> The Agency views the court's opinion as applying to the "agency's authority to regulate secondary materials reused within an industry's ongoing production process" as solid waste. *AMC,* 824 F.2d at 1178. *See also, id.* at n. 3, describing as "the central issue—whether EPA's interpretation that the term 'discarded material' encompasses materials destined for recycling in an on-going production process is contrary to the statute."
> The facts described in the opinion involved two particular types of in-house recycling practices in the petroleum refining and mining (primary smelting) industries.

\*    \*    \*    \*    \*    \*

> The court acknowledged that certain types of recycling activities remain within the Agency's authority, because they involve a form of discarding. *E.g., id.* at n. 14 (describing used oil recycling activities). *Id.* at 1191 and n. 20 (describing a metal reclamation operation storing met-

al-bearing materials in open piles, and a pesticide drum reused as a trash container).

\*    \*    \*    \*    \*    \*

> The court's decision does not affect the Agency's authority to regulate as hazardous wastes those secondary materials recycled in ways where the recycling activity itself is characterized by discarding as defined by the court. That is, manufacturing processes (or other types of recycling) involving an element of discard which do not involve secondary materials passing through a continuous, ongoing manufacturing process remain within the Agency's jurisdiction.

53 Fed.Reg. 519, 520 (January 8, 1988).

Moreover, Colorado's role in implementing RCRA does not warrant delay in ruling. Because a federal court will not review a state agency's determinations, the doctrine of primary jurisdiction does not permit a federal court to defer to a state agency on a matter of federal law. *United States v. Environmental Waste Control, Inc.,* 710 F.Supp. at 1194. Where, as here, the issue is strictly legal, a court need not defer to a state agency. *Board of Education v. Harris,* 622 F.2d 599, 607 (2d Cir.1979) *cert. denied,* 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981); *Merry v. Westinghouse Elec. Corp.,* 697 F.Supp. 180, 183 (M.D.Pa.1988). Finally, Colorado has indicated no desire to delay resolution of the issue before me. To the contrary, in an *amicus* brief filed on June 26, 1989, Colorado opposed DOE's motions to stay this action.

Also, RCRA specifically sets forth the narrow circumstances under which agency action may interfere with citizen enforcement. Under 42 U.S.C. § 6972(b)(1)(B), prosecution of the citizen suit is barred only if, before plaintiff files suit, a state or federal agency "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance." To delay this action pending the outcome of DOE/Colorado negotiations would defeat Congress' intent to allow citizen enforcement whenever there is no "diligent prosecution in court." *See Proffitt v. Rohm & Haas,* 850 F.2d 1007,

1012 (3d Cir.1988) ("[I]t is questionable whether the EPA can bar a citizen's suit by any means other than its own diligent prosecution."); *United States v. Environmental Waste Control, Inc.,* 710 F.Supp. at 1195 (The doctrine of primary jurisdiction is unsuitable to citizen suits.); *Northwest Environmental Defense Center v. Unified Sewerage Agency,* 30 Envt.Rep.Cas. (BNA)1117, 1126, 1989 WL 81608 (D.Or. 1989); *See also Natural Resources Defense Council v. Outboard Marine Corp.,* 692 F.Supp. 801, 809 (N.D.Ill.1988).

Finally, DOE has advanced no cogent reason why this civil determination would have "punitive implication" relative to any ongoing criminal investigation. Such concerns are speculative.

Based upon the RCRA provisions and regulations, the D.C. Circuit's opinions in *AMC* and *CWM,* and EPA's determinations, I conclude that Sierra Club is entitled to partial summary judgment declaring that the dry combustible waste, kimwipes, aqueous waste, laboratory waste oil, rags, trash, and spent solvents, that formerly were burned in the building 771 incinerator and now are stored pending resumption of plutonium recovery operations, as well as residues from the building 771 incinerator, although mixed with plutonium, are hazardous waste. Accordingly, IT IS ORDERED AND DECLARED that:

1. Sierra Club's motion for partial summary judgment is GRANTED.

2. All substances listed at 40 C.F.R. Part 261, Subpart D or possessing characteristics set forth at 40 C.F.R. Part 261, Subpart C, and that defendants have burned in an incinerator or are storing pending treatment in a plutonium recovery process are RCRA Subtitle C hazardous wastes.

3. All substances (except plutonium) mixed with listed hazardous wastes are RCRA Subtitle C hazardous wastes.

4. All residues (except plutonium) from incineration or other treatment in a plutonium recovery process of hazardous wastes are RCRA Subtitle C hazardous wastes.